IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| THOMAS MCLAUGHLIN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | NO. 3:26-cv-00303 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| BROCK PIERCE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is a "Motion for Temporary Restraining Order With Potential Conversion To Preliminary Injunction" (Doc. No. 9, "Motion"), filed by Thomas McLaughlin, Tim Flaherty, Jake Flaherty, and Michael Miglio (collectively, "Plaintiffs"). Via the Motion, Plaintiffs move pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65.01 for entry of a temporary restraining order ("TRO") enjoining Defendants, Brock Pierce and Scott Walker, from removing certain assets "from DNA Venture Holdings, LLC, exercising control over the[se] [a]ssets, or taking any other action to transfer or encumber the[se] [a]ssets during the pendency of this lawsuit[.]" (Doc. No. 9 at 1). Plaintiffs also request that "a hearing [ ] be held on this matter for the purpose of converting the restraining order [(if granted)] [in]to a preliminary injunction." (Doc. No. 9-1 at ¶ 76).[1] Accompanying the Motion is a memorandum in support of the Motion

---

[1] As noted above, Plaintiffs move the Court for a TRO pursuant to Federal Rule of Civil Procedure 65. (Doc. No. 9 at 1). Notably, however, where Fed. R. Civ. P. 65 refers to TROs, it refers only to TROs issued "without written or oral notice to the adverse party," Fed. R. Civ. P. 65(b)(1), which the Court in this footnote will call an "*ex parte*" TRO (since "*ex parte*" means "on one side only; by or for one party; done for, in behalf of, or on the application of one party only." Black's Law Dict. (6th ed. 1990) p. 76.). Rule 65 prescribes rules for the issuance and duration of an *ex parte* TRO. It does not mention, let alone set any

(Doc. No. 9-1, "Memorandum"). Filed with the Motion and Memorandum are fourteen exhibits (Doc. Nos. 9-2 – 9-15), which include declarations of each of the Plaintiffs (Doc. Nos. 9-11 – 9-14), along with a proposed order (Doc. No. 9-16, "Proposed Order").

For the reasons described below, the Motion (Doc. No. 9) is **DENIED**.

BACKGROUND[23]

On March 13, 2026, Plaintiffs filed their complaint (Doc. No. 1, "Complaint") in this Court. This action arises in large part (though not entirely) out of a dispute over cryptocurrency ("crypto") investments and other types of investments made into DNA Venture Holdings, LLC ("DNA"). (*Id.*). Plaintiffs contend that Defendants (through Defendants' conduct relating to the procurement

---

rules for, TROs that are not *ex parte*; to the extent that temporary injunctive relief that is not issued *ex parte* is properly called a TRO, such a TRO is simply not within the scope of Rule 65.

When the Motion was first filed, Plaintiffs did not provide notice to Defendants of the Motion. (Doc. No. 9 at 3). However, since the filing of the Motion, counsel for Defendants have appeared (Doc. Nos. 11-12), and Defendants have filed a motion (Doc. No. 13) for a briefing schedule on the Motion, meaning that Defendants in all likelihood now have notice of the Motion. In theory, this would now mean that Plaintiffs' Motion is not an *ex parte* TRO as contemplated by Rule 65. Nevertheless, the Court will treat Plaintiffs' Motion as properly brought under Fed. R. Civ. P. 65 for two reasons. First, although the Court need not delve herein into how or why this is the case, parties and courts have been known to speak as if a motion can be one for a TRO within the scope of Rule 65 (and not a preliminary injunction, which is governed by other provisions of Rule 65) even if it is made *with* notice to the opposing party. *E.g., In re Reynolds*, No. 23-22086, 2023 WL 11853230, at *3 (Bankr. W.D. Tenn. Sept. 1, 2023) (A temporary restraining order is a temporary order entered in an action, *often* without notice . . . .").

And second, although Defendants have likely been put on notice of the Motion, the Court's decision here comes before Defendants have responded to the Motion and before the Defendants necessarily would have had a full opportunity to respond to the Motion.

Accordingly, the Court will continue its analysis as if Plaintiffs' Motion is properly brought under Fed. R. Civ. P. 65(b)(1).

[2] The following facts, unless somehow qualified herein (as for example by "Plaintiff alleges that"), are taken as true for purposes of the Motion (though not necessarily for any future purposes in this litigation), because they are *either:* (1) (a) evidentially supported at least to some degree by Plaintiff; and (b) plausible; *or* (2) subject to judicial notice.

[3] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page __ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document. In addition, where the Complaint or Memorandum are cited herein without including a paragraph symbol, the citation is not to a paragraph number but rather to a page that contains the cited content outside the boundaries of any paragraph.

and use of investments into and in DNA, as well as other conduct not germane to the instant Motion) have violated the Racketeer Influenced and Corrupt Organizations (RICO) Act (Count I) (Doc. No. 1 at ¶¶ 104-12), have committed fraud (Count II) (*id.* at ¶¶ 113-17); and have breached the covenant of good faith and fair dealing (Count III) (*id.* at ¶¶ 118-23). Plaintiffs also allege that the corporate entity that Defendants operate, DNA, is the Defendants' alter-ego (Count IV) (*id.* at ¶¶124-27), and that Plaintiffs are entitled to punitive damages (Count V) (*id.* at ¶¶128-29). Via the Complaint, Plaintiffs seek various forms of monetary relief, including (1) "[c]ompensatory damages in an amount to be determined at trial in an amount not less than $50 million;" (2) "[d]isgorgement of profits [and] money unjustly received by Defendants as determined at trial;" (3) "[t]reble damages under RICO"; (4) "[p]unitive damages;" (5) "[t]he costs and expenses of this action, including Plaintiffs' reasonable attorneys' fees and any other reasonable professional or expert fees which may be incurred;" and (6) "[s]uch other and further relief as the Court deems just and proper under the circumstances." (*Id.* at 42-43). Notably, the Complaint requests *only* monetary relief and  contains no request for injunctive or declaratory relief.[4]

Below, the Court will first address the factual background underlying this action as relevant to the instant Motion, including the identities of the parties to this action, then examine the relief sought via the Motion. Importantly, Plaintiffs' Motion arises solely out of the dispute over investments into DNA. So, in its review of the factual background of this action below, the Court will, for the sake of brevity, focus exclusively on that dispute.

---

[4] The Court does not discern Plaintiffs' request for  "[s]uch other and further relief as the Court deems just and proper under the circumstances" to be a request for either declaratory or injunctive relief. (Doc. No. 1 at 43).

1. <u>Factual Background</u>

Plaintiffs are each investors in DNA. (Doc. No. 1 at ¶¶ 101, 103). Defendants are two individuals with a long involvement in the crypto industry. (Doc. No. 1 at ¶ 16). In 2024, Defendants "began raising money for" DNA, "with the promise that they would put at least $100 million of valuable assets into DNA and take it public as a digital asset treasury." (Doc. No. 9-1 at ¶ 1; Doc. No. 9-12 at ¶ 2). Plaintiffs allege that DNA is under the complete control of Defendants, who control "its finances, [] its policies and [its] business practices." (Doc. No. 9-1 at ¶ 70). Further, Defendants are the only members of the Board of Directors of DNA. (Doc. No. 9-1 at ¶ 4).

In October 2025, Defendants "contributed valuable assets potentially worth hundreds of millions of dollars to DNA (the "Assets")." (Doc. No. 9-1 at ¶ 2; Doc. No. 9-11 at ¶ 2). The Assets are made up of "digital currency and membership interests in non-public companies" (Doc. No. 9-1 at ¶ 72) and are "potentially worth hundreds of millions of dollars." (Doc. No. 9-1 at ¶ 2; Doc. No. 9-11 at ¶ 2). The assets making up the Assets are listed in Schedule A and Schedule B of the "Agreement for the Contribution of Additional Capital Assets" (Doc. No. 9-3 at 5-9, "Contribution Agreement"), which was filed as an exhibit to the Motion.

"Unbeknownst to DNA investors," such as Plaintiffs, Defendants included in the Contribution Agreement "a claw back provision allowing them to take the Assets back if DNA had not completed a merger with a NASDAQ listed entity by March 27, 2026 – or if DNA abandoned the effort sooner." (Doc. No. 9-1 at ¶ 3; Doc. No. 9-13 at ¶ 4).[5] Further, "in an effort to

---

[5] The at-issue claw back provision is in § 3.1 of the Contribution Agreement, and provides:

> If the Merger Transaction is either abandoned or otherwise is not consummated by March 27, 2026 (the "Outside Date"), then, during the 90 day period following such abandonment or Outside Date, whichever is sooner each of Walker and Pierce shall be entitled to demand

recover the Assets" through the claw back provision, Defendants caused DNA "to abandon the effort to merge DNA with a NASDAQ [listed] company." (Doc. No. 9-1 at ¶ 3; Doc. 9-11 at ¶ 2). Among other things, Defendants (1) refused "to fund money necessary to pay the accounting consulting firm responsible for financial statements, resulting in the termination of the contract with such accountants;" (2) refused "to provide DNA's CFO with information necessary to verify the existence, ownership, and value of each of the Assets;" (3) laid "off the majority of DNA staff;" and merged "DNA's only profitable business line into a NASDAQ entity (SONM) without contributing any of the Assets as part of the merger." (Doc. No. 9-1 at ¶ 3; Doc. 9-11 at ¶ 2).[6] In other words, Defendants have engaged in conduct that would trigger the claw back provision in the Contribution Agreement and would thereby allow Defendants to claw back the Assets they had invested in DNA.

Subsequently, Plaintiffs contacted DNA "to verify that all Assets remained with DNA." (Doc. No. 9-1 at ¶ 4; Doc. No. 9-4). DNA's attorney, Williams Hughes, informed Plaintiffs that

---

the immediate return of all or any portion of the Walker Contributed Assets or the Pierce Contributed Assets, respectively, to Walker or Pierce or such affiliate thereof as each of them may direct, respectively (the "Return Right"); whereupon the Company shall immediately return such Contributed Assets, together with all proceeds therefrom and distributions thereon, for no consideration. The "Unwind Period" means the period beginning on the contribution date of any Contributed Asset and ending 90 days after the Outside Date or abandonment of the Merger, whichever occurs first. Within 30 days after a Contributor's written election to return any Contributed Asset, the Company shall deliver that Contributed Asset and all proceeds free of Company created liens.

(Doc. No. 9-3 at § 3.1). For context, the Court notes that the term "Merger Transaction" as used in the provision above is defined as merging DNA "with a NASDAQ-listed company." (Doc. No. 9-3 at 1).

[6] Although Defendants merged "DNA's only profitable business line into a NASDAQ entity (SONM)" (Doc. No. 9-1 at ¶ 3), this seemingly did not negate the claw back provision permitting Defendants to take the Assets "back if DNA had not completed a merger with a NASDAQ listed entity by March 27, 2026." (Doc. No. 9-1 at ¶ 3). The Court discerns, although the brief and the Contribution Agreement are not entirely clear on this point, that only the merger of *all* of DNA (rather than merely one of DNA's business lines) with a NASDAQ listed entity by March 27, 2026, would negate the claw back provision.

"DNA has not encumbered or transferred any assets subject to the Agreement for the Contribution of Additional Assets. This is not to say that they cannot be transferred or encumbered as per the terms of that agreement, but as of this date, they have not." (Doc. No. 9-4 at 2). DNA's attorney further noted that "[u]nder our interpretation of this Agreement, there is currently no impediment to such a transfer. Nonetheless, a transfer would require action and approval of the Board of Directors of the company." (Doc. No. 9-4 at 5). While Defendants "have not yet demanded that DNA return the Assets, they could do so at any time," (Doc. No. 9-1 at ¶ 4), given that Defendants are the sole members of DNA's Board of Directors. Thus, Plaintiffs are concerned that "upon receiving notice of this lawsuit, [Defendants] will immediately cause DNA to transfer the Assets back to themselves (certainly, no later than March 27, 2026) and, given the digital nature of most of the Assets, remove them beyond the jurisdictional authority of this Court." (*Id.*).[7]

2. <u>Relief Sought via the Motion and Plaintiffs' Arguments in Support of the Motion</u>

Via the Motion, Plaintiffs seek (as shown by the Proposed Order) a TRO restraining Defendants "from removing the Assets from DNA, exercising control over the Assets, or taking any other action to transfer or encumber the Assets until a hearing on [converting the requested TRO, if granted, into a] Preliminary Injunction." (Doc. No. 9-16 at 4). In effect (if not in explicit terms), what Plaintiffs seek via the Motion is a prejudgment freeze of the Assets. Plaintiffs effectively admit this via their contention that "Plaintiffs have a reasonable concern that Defendants will transfer the Assets beyond the reach of this Court if the Court does not issue injunctive relief" and "[i]f the Assets are moved beyond the reach of this Court, entry of a judgment against Defendants will do nothing to make Plaintiffs whole." (Doc. No. 9-1 at ¶ 72).

---

[7] As noted above, although the claw back provision allows Defendants "to take the Assets back if DNA had not completed a merger with a NASDAQ listed entity by March 27, 2026," the claw back provision also permits Defendants to take back the assets earlier than March 27, 2026 if "DNA abandoned the effort" to merge with a NASDAQ listed company prior to March 27, 2026. (Doc. No. 9-1 at ¶ 3).

Plaintiffs argue that the Motion should be granted because (1) Plaintiffs are likely to succeed on the merits of each of the claims in their Complaint (Doc. No. 9-1 at ¶¶ 68-71); (2) Plaintiffs will suffer immediate and irreparable harm in the absence of their requested injunctive relief because "Plaintiffs have a reasonable concern that Defendants will transfer the Assets beyond the reach of this Court if the Court does not issue injunctive relief" and "[i]f the Assets are moved beyond the reach of this Court, entry of a judgment against Defendants will do nothing to make Plaintiffs whole." (*id.* at ¶ 72); (3) the balance of equities favors Plaintiffs because "Defendants had no reasonable expectation of ever being able to personally utilize the Assets after their contribution to DNA" and so "Defendants are not harmed by an order requiring them to leave the Assets within DNA" (*id.* at ¶ 73); and (4) the injunctive relief serves the public interest because the public "has an interest in a safe and orderly [c]rypto industry." (*Id.* at ¶ 74). Plaintiffs further contend that they should not be required to post security prior to the issuing of their requested injunctive relief. (*Id.* at ¶ 75).

<u>LEGAL STANDARD</u>

A "TRO is an extraordinary and drastic remedy . . . ." *Ahrouch v. Boulakhrif*, No. 2:25-CV-02535-SHL-CGC, 2025 WL 1490494, at *2 (W.D. Tenn. May 23, 2025) (quoting *Proctor & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996)). Those seeking a TRO (or, for that matter, a preliminary injunction)[8] must meet four requirements.[9] They must show a likelihood

---

[8] The standards for evaluating a request for both a TRO and a preliminary injunction are the same. *G.S. ex rel. Schwaigert v. Lee*, 558 F. Supp. 3d 601, 607 (W.D. Tenn. 2021). Thus, in addressing Plaintiffs' request for a TRO, the Court will, at times, utilize case law that addresses requests for preliminary injunctions rather than requests for TROs.

[9] Published Sixth Circuit case law stands unmistakably for the proposition that these four items are factors rather than requirements, except that irreparable harm is a requirement (and, if it exists and thus keeps the possibility of a TRO alive, thereafter becomes a factor to be balanced along with the other three factors). *See, e.g., D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019). Alas, this case law is inconsistent

of success on the merits; irreparable harm in the absence of the injunction; the balance of equities

favors them; and that the public interest favors an injunction. *Winter v. Nat. Res. Def. Council*, 555

U.S. 7, 20 (2008); *Sisters for Life, Inc. v. Louisville-Jefferson County*, 56 F.4th 400, 403 (6th Cir.

2022).

---

with other (including more recent) Sixth Circuit case law and with Supreme Court cases (including *Winter*) that describe these as all being requirements (i.e., things that *must* be established. *See, e.g., id.* at 328, 329 (Nabaldian, J., concurring) (noting that "[*Winter*]'s language seems clear—a plaintiff *must* establish the factors" and questioning "whether the balancing analysis itself aligns with *Winter.*").

Notably, other courts have likewise treated the four items as requirements (prerequisites), rather than as factors. *E.g., Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003); *Southern Poverty Law Ctr. v. United States Dep't Homeland Sec.*, Civil Action No. 18-760 (CKK), 2020 WL 3265533, *10 (D.D.C. June 17, 2020); *Transatlantic, LLC v. Humana, Inc.*, 8:13–CV– 1925–T–17TBM, 2013 WL 3958361, *1 (M.D. Fla. Aug. 1, 2013).

The Court believes that it needs to choose between the two approaches—even if the substance or the outcome of the Motion does not turn on such choice—because the approach does dictate how a court goes about explaining its analysis and decision on a motion for a TRO. And the Court believes that it should follow the latter line of cases, i.e., those that treat the standard as involving requirements rather than factors.

First, explaining and applying the standard in terms of requirements is substantially more straightforward than the alternative—which is to explain that the four items are factors to be balanced, except that, well, that's only partially true because actually irreparable harm *is* a requirement (but also, if it exists, *then* a factor to be balanced along with the other factors) and likelihood of success (at least to some minimal extent) is also required. *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019) ("Thus, although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory."); *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (noting that it is reversible error for a district court to issue a preliminary injunction "where there is simply no likelihood of success on the merits (quoting *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010))). Second, it is easier to articulate a conclusion as to whether requirements are satisfied (which is done in simple yes/no, or satisfied/unsatisfied, terms) than to articulate the outcome of some so-called "balancing" of (mismatched) factors. This is especially true given that case-specific balancing apparently is based in part on some inscrutable sliding scale of required likelihood of success on the merits that depends on the strength of the other three factors. *See, e.g., In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985) ("[T]he degree of likelihood of success required may depend on the strength of the other factors.").

The Court notes that herein it quotes some case law that refers to these items as "factors" and describes them in language that befits factors more than requirements—as for example by referring to the i*ssue* of *whether* issuing the injunction would harm others (factor-style language) rather than the *requirement* that the balance of equities favors the movant, or the issue of where the public interest lies (factor-style language) rather than the requirement that the public interest favors an injunction. In so doing, the Court is confident that the astute reader readily will be able to translate the factor-style language into the corresponding language of requirements for purposes of following the Court's analysis herein. The Court also notes that even in some opinions where the court clearly treats the four items as requirements, the court therein at times refers to them as "factors." *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 677 (N.D. Tex. 2016).

Plaintiffs seeking a TRO may not merely rely on unsupported allegations but rather must come forward with more than "scant evidence" to substantiate their allegations.[10] *See, e.g.,* *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 417 (6th Cir. 2014); *Cameron v. Bouchard*, 815 F. App'x 978, 986 (6th Cir. 2020) (vacating preliminary injunction when plaintiffs made no evidentiary showing on some elements of their claim, but instead made mere allegations regarding the treatment of COVID-19 in prisons); *McNeilly v. Land*, 684 F.3d 611, 614 (6th Cir. 2012) (upholding denial of preliminary injunction when plaintiff made only a "small showing" of evidence); *United States v. Certain Land Situated in City of Detroit*, No. 95-1118, 1996 WL 26915, *1 n.1 (6th Cir. Jan. 23, 1996) (noting a lack of evidence to support speculative allegations); *Boulding v. Corr. Med. Servs.*, No. 1:06-CV-811, 2008 WL 2095390, at *1 (W.D. Mich. Feb. 11, 2008), *report and recommendation adopted*, No. 1:06-CV-811, 2008 WL 2095387 (W.D. Mich. May 15, 2008) ("Plaintiff did not marshal any evidence in support of his motion [for a preliminary injunction]. Plaintiff's unsupported allegations do not suffice." (citations omitted)). In deciding a motion for a TRO, a court may consider the entire record, including affidavits and other hearsay evidence. *Sterling v. Deutsche Bank Nat'l Tr. Co.,* 368 F. Supp. 3d 723, 725 (S.D.N.Y. 2019); *J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018). In conducting the TRO analysis, the Court is not limited to the four corners of the complaint but rather may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding. *Express Franchise Servs., L.P. v. Impact Outsourcing Sols., Inc.*, 244 F. Supp. 3d 1368, 1379 (N.D. Ga. 2017); *Action NC v. Strach*, 216 F. Supp. 3d 597, 629 (M.D.N.C. 2016)

---

[10] When courts refer to this principle, usually it is in connection with a motion for a preliminary injunction rather than a motion for a TRO. But it has been stated in connection with a motion for a TRO, *e.g., Dates v. HSBC*, 721 F. Supp. 3d 616, 624 (S.D. Ohio 2024), and the Court believes that it applies to a motion for a TRO just as it applies to a motion for a preliminary injunction.

(explaining that district courts in appropriate circumstances rely on hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted).

## ANALYSIS

As noted, a party seeking grant of a TRO must show that: (1) it has a likelihood of success on the merits; (2) it will suffer irreparable harm in the absence of relief; (3) the balance of equities favors it; and (4) the requested TRO would serve the public interest. *Winter*, 555 U.S. at 20.

Here, the Court will rest its analysis of the instant Motion on the second of these four requirements: that Plaintiffs are likely to suffer irreparable harm in the absence of their requested injunction. As will be explained further below, it is on this requirement that Plaintiffs' Motion founders.

To obtain a TRO, a movant must show the presence of a threat of immediate, irreparable harm. Fed. R. Civ. P. 65(b)(1)(A) (requiring a court to examine, on application for a TRO, whether "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant.").

"Rule 65(b) is clear that the possibly drastic consequences of a restraining order mandate careful consideration by a trial court faced with such a request." *Westfield Ins. Co. v. Pavex Corp.*, Case No. 17-14042, 2017 WL 6407459, at *1 (E.D. Mich. Dec. 15, 2017). Before a court may issue a TRO, "it should be assured that the movant has produced compelling evidence of irreparable and immediate injury." *Id*. Importantly, it is well-established that a plaintiff's harm is not irreparable if it is fully compensable by money damages. *Id*.

As noted above, Plaintiffs' Motion seeks a TRO (and for that TRO, if granted, to be converted to a preliminary injunction after a hearing) restraining Defendants from "from removing the Assets from DNA, exercising control over the Assets, or taking any other action to transfer or

encumber the Assets until a hearing on [converting the requested TRO, if granted, into a] Preliminary Injunction." (Doc. No. 9-16 at 4). As noted above, what Plaintiffs seek in effect is a prejudgment freeze of certain assets, namely the Assets. Plaintiffs effectively admit this and argue that "Plaintiffs have a reasonable concern that Defendants will transfer the Assets beyond the reach of this Court if the Court does not issue injunctive relief" and that "[i]f," (according to Plaintiffs), "the Assets are moved beyond the reach of this Court, entry of a judgment against Defendants will do nothing to make Plaintiffs whole." (Doc. No. 9-1 at ¶ 72).

However, Plaintiffs' Complaint, which asserts (among other things) claims against Defendants based on RICO, fraud, and the covenant of good faith and fair dealing seeks only *monetary damages* and indeed alleges facts that point solely to a *pecuniary loss*. To put it another way, Plaintiffs' request to freeze the Assets is made solely for the purpose of securing satisfaction of any judgment they might ultimately obtain on their claims for monetary damages. This was likewise the case in *Eberhard v. Physicians Choice Laboratory Servs., LLC*, No. 3:15-0156, 2016 WL 6432794, at *2-3 (M.D. Tenn. Oct. 31, 2016). But as noted in *Eberhard*, "[t]hat kind of equitable relief has been unavailable to a prejudgment creditor for more than 200 years of American jurisprudence." *Id*. at *3.

Indeed, in *Grupo Mexicano de Desarrolo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), the Supreme Court held that a district court had no authority to issue a preliminary injunction—and thus, it follows, a TRO—to prevent a defendant from disposing of assets pending adjudication of a plaintiff's claim for monetary damages. *Id*. at 333, *cited in Westfield*, 2017 WL 6407459, at *2. *Grupo Mexicano* involved a breach of contract claim for money damages, and the Court held that, prior to the entry of judgment, a creditor cannot invoke a court's equitable powers to freeze assets to be later used to satisfy a money judgment. *Grupo Mexicano*, 527 U.S. at 321,

325; *Eberhard*, 2016 WL 6432794, at *3. More recently, in the *Eberhard* case discussed just above, this district court held that the relief requested— "namely, to prevent a suspected sale of assets"—was sought to protect an anticipated, but as of yet uncertain, judgment, and therefore the plaintiffs' request to freeze assets was denied. *Id*.[11] Similarly here, Plaintiffs effectively concede via the Motion that their sought-after TRO is to protect their ability to collect on any judgment they may obtain. Indeed, Plaintiffs expressly state that their concern is that "if the Assets are moved beyond the reach of this Court, entry of a judgment against Defendants will do nothing to make Plaintiffs whole." (Doc. No. 9-1 at ¶ 72). As in *Grupo Mexicano*, however, the Court has no authority to issue a TRO (or a preliminary injunction) to prevent Defendants from transferring their assets pending adjudication of Plaintiffs' claims for money damages. *Grupo Mexicano*, 527 U.S. at 333.

Moreover, even assuming that the Court did have such authority at least in some circumstances, it would decline to exercise such authority here. Plaintiffs assert that they are entitled to a prejudgment freeze of the Assets given that they "have a reasonable concern that Defendants will transfer the Assets beyond the reach of this Court if the Court does not issue injunctive relief" and given that (according to Plaintiffs) "[i]f the Assets are moved beyond the reach of this Court, entry of a judgment against Defendants will do nothing to make Plaintiffs whole." (Doc. No. 9-1 at ¶ 72). Plaintiffs also seem to point to the unique nature of the Assets— namely the fact that the Assets are digital currency and membership interests in non-public

---

[11] In *Grupo Mexicano*, the Supreme Court drew on the history of courts of equity since the Judiciary Act of 1789, which granted authority to administer in equity suits "the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries." *Grupo Mexicano*, 527 U.S. at 318.

companies—in support of their argument for a prejudgment freeze of the Assets. (*Id.*). However, these arguments do not satisfy the substantial burden to show irreparable harm.

As an initial matter, Plaintiffs have not shown that they would be unable to obtain satisfaction of any (potential future) judgment against Defendants through other means or from other assets of Defendants. *See Cunningham v. First Class Vacations, Inc.*, No. 3:16-cv-2285, 2019 WL 1306214, at *2 (M.D. Tenn. Jan. 11, 2019) (considering request for asset freeze in the form of a TRO and finding plaintiff did not show irreparable harm where plaintiff presented no evidence it "would be unable to satisfy any judgment through other means or from other assets" of defendants). Moreover, Plaintiffs' concern about being unable to be made whole absent a freeze of the Assets does not justify injunctive relief, let alone immediate injunctive relief in the form of a TRO, in order to avoid frustration in collecting a judgment that has not yet been entered. *See Casa de Oración Atlanta, Inc. v. Balvaneda*, Case No. 1:18-cv-05214, 2018 WL 7953302, at *2 (N.D. Ga. Dec. 14, 2018) ("'preliminary injunctive relief freezing a defendant's assets in order to establish a fund with which to satisfy a potential judgment for money damages is simply not an appropriate exercise of a federal district court's authority.' . . . Plaintiff cannot attempt—by seeking injunctive relief now—to proactively set aside funds to satisfy a possible judgment in the future" (quoting *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1530 (11th Cir. 1994)). Furthermore, Plaintiffs likewise have failed to show, despite the (potentially) unique nature of the Assets, that Plaintiffs cannot somehow be compensated monetarily for any damages that would result from the transfer of these Assets "beyond the reach of this Court." (Doc. No. 9-1 at ¶ 72).

As this Court has stated, a TRO is an extraordinary remedy, and ruling upon a motion for a TRO requires a federal court to put aside other matters and take immediate action. *Cunningham*, 2019 WL 1306214, at *2. If Plaintiffs' alleged irreparable harm were considered sufficient to

warrant a TRO, then every potential plaintiff fearing transfer of specific assets before it has a judgment would be able to satisfy the immediate and irreparable harm requirement for a TRO. This simply cannot be the case. "The public interest is not served by allowing such interruptions to the functioning of the federal court under these circumstances." *Id*.

In other words, even assuming that the Court did have the authority to issue Plaintiffs' requested TRO, it would decline to exercise such authority here, given that Plaintiffs have failed to demonstrate, as required for a TRO to issue, that they are likely to suffer irreparable harm absent their requested injunctive relief.

<u>CONCLUSION</u>

"A preliminary injunction [or TRO] is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729,739 (6th Cir. 2000)). It bears emphasizing why a TRO is deemed an extraordinary remedy subject to stringent requirements: the party receiving it is treated, while the litigation is ongoing, in some respects as if it had ultimately prevailed on its claims even though it has not yet done so and could not possibly do so until the litigation is concluded. It is no small thing for a party to be treated (even if only temporarily and for a limited purpose) as if it had ultimately prevailed on the merits of its claims when in fact it has not yet done so. *See Doughtie & Co. v. Rutherford Cnty.*, No. 3-13-0209, 2013 WL 3995277, at \*1 (M.D. Tenn. Aug. 5, 2013) ("Essentially, [the p]laintiff is asking the Court to order, on the 'front end' of this action, the relief it ultimately seeks in this lawsuit. The Court finds that [the p]laintiff has failed to show the need for this extraordinary relief.").

Therefore, Plaintiffs' Motion (Doc. No. 9) is **DENIED**.[12] Given this denial, Defendants'

motion (Doc. No. 13) for a briefing schedule on the Motion is **DENIED** as moot.

IT IS SO ORDERED.

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[12] Given that the Court is denying Plaintiffs' requested TRO, the Court also denies Plaintiffs' request for a hearing to consider converting that TRO to a preliminary injunction.